# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| TON JULIUS THOMAS | * |
| Plaintiff | * |
| v | *  Civil Action No. CCB-16-2737 |
| WARDEN ARMSTEAD, et al. | * |
| Defendants | * |

## MEMORANDUM

In response to a complaint filed by the plaintiff Ton Julius Thomas, the defendants Warden Laura Armstead, Officer Muhammad Raja, and Director Randall Nero, Ph.D., ("state defendants"), and Damon Fayall and Wexford Health Services, Inc., ("medical defendants"), have moved for dismissal under Rule 12(b)(6) or, in the alternative, summary judgment. ECF 18 and 37. The plaintiff, for his part, filed a motion for summary judgment, ECF 27, asserting that the defendants failed to properly investigate his administrative claims. The court finds a hearing unnecessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons stated below, the defendants' motions, construed as motions for summary judgment,[1] will be granted and the plaintiff's motion for summary judgment will be denied.

**I.     Background**

The plaintiff, Ton Julius Thomas, is an inmate confined at Patuxent Institution who suffers from chronic epilepsy. ECF 18 at Ex. 1, p. 1. Plaintiff argues that the defendants violated his Eighth Amendment protection from cruel and unusual punishment by failing to provide

---

[1] Defendants' dispositive submissions will be treated as motions for summary judgment under Federal Rule of Civil Procedure 56 because materials outside the original pleadings have been considered. Fed. R. Civ. P. 12(d); *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

adequate medical care.[2] Specifically, the plaintiff claims that he has a two year history of overdoses on his anti-epilepsy medication, that prison medical staff has on occasion failed to respond timely to his medical emergencies, and that Corrections Officer Raja failed to seek medical help during one of the plaintiff's seizures. The plaintiff also has filed a motion for summary judgment arguing that the defendants failed to properly investigate his administrative complaints. ECF 27.

    A. Plaintiff's Medical History

The plaintiff suffers from chronic epilepsy. ECF 18 at Ex. 1, p. 1. From February 2012 until March 2016, the plaintiff was prescribed phenytoin (dilantin), an anti-epileptic drug used to treat epilepsy. *Id.* at 2–3. Dosages of phenytoin need to be carefully monitored through phenytoin tests, examinations that determine how much phenytoin is in a patient's blood stream, to ensure that the drug remains at therapeutic levels. *Id.* at 3. The therapeutic range for phenytoin is between 10 and 20 ug/ml,[3] toxic levels are greater than 30 ug/ml, and at 100 ug/ml or above the drug becomes lethal. *Id.* at 3.

The plaintiff's phenytoin levels have varied over time but repeatedly exceeded the therapeutic range of the drug. ECF 23 at pp. 3–5. Although fluctuations in phenytoin levels can be caused by latent medical conditions, improper dosing (either by the plaintiff's failure to take the medication or the plaintiff taking too much of the medication), or by other medications, none of these explanations was identified as the cause of the plaintiff's overdosing. ECF 18 at p. 4. When the fluctuations were detected the high levels were treated by discontinuing administration of phenytoin until the levels returned to a therapeutic range. *Id.* at p. 5.

---

[2] "It is settled law that the allegations" in a prisoner's complaint, "'however inartfully pleaded' are held 'to less stringent standards than formal pleadings drafted by lawyers.'" *Hughes v. Rowe*, 449 U.S. 5, 9–10 (1980) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).
[3] The abbreviation "ug/ml" stands for "microgram per milliliter" and is a measurement of concentration in the blood. *See* http://medical-dictionary.thefreedictionary.com.

Despite the plaintiff's phenytoin prescription and his assurances that he was taking his medication, the plaintiff suffered occasional breakthrough seizures. ECF 18 at Ex. 2, pp. 2–3.

B.   Plaintiff's Complaint

Against this medical background the plaintiff offers a history of past medical incidents, in addition to describing his phenytoin overdoses, in support of his allegation that he has received insufficient medical care.

The first medical incident plaintiff complains of occurred "sometime in March" 2014 in which his phenytoin level was "way to[o] high" and he was transferred to the hospital at Jessup Correctional Institution (JCI), where he was given an IV. ECF 23 at p. 3. Plaintiff remained there for 30 days. *Id*.

A few months later, on May 7, 2014, the plaintiff had a seizure while sitting in the Patuxent dining hall. ECF 1 at p. 7. According to the plaintiff, the medical unit's attempt to treat him failed and, as a result, he was sent to Howard County General Hospital for further treatment. *Id.* The hospital performed a blood test which revealed that the plaintiff's phenytoin level was above the therapeutic range. *Id.* He was given an IV and prescribed new medication before being sent back to Patuxent. *Id.*

The plaintiff would have little recovery time. Only two months after the May 7 incident, the plaintiff reportedly felt sleepy. The medical unit took a blood test which found that the plaintiff's phenytoin level was too high "and he needed to stop taking" his medication to avoid going into a seizure. *Id.* Over the course of about two years, medical staff examining the plaintiff would repeatedly find that his phenytoin levels exceeded their therapeutic range. *Id.* at pp. 3–5.

The next major incident occurred on May 5, 2015, when Officer Raja, a corrections officer at Patuxent, allegedly failed to seek medical help for the plaintiff. As the plaintiff tells it,

3

his cellmate, D. Washington, called out to Officer Raja informing him that the plaintiff was having a seizure. ECF 1 at p. 2. Despite being told three times by Washington that the plaintiff's seizure was a medical emergency and he required immediate medical help, Officer Raja simply told Washington to "stand by." *Id*.

The plaintiff claims that Officer Raja never called for medical assistance and he only received medical attention after a nurse called Officer Raja and told him that the plaintiff should report back to the medical office because he left his pass there during an earlier visit. *Id.* The plaintiff eventually made it to the medical unit. He informed the nurses that his "level is to[o] high," referring to his phenytoin level, and that he had a seizure but Officer Raja would not let him out of his cell. *Id*. Plaintiff claims that the nurse tried to take him to see a Physician's Assistant ("PA"), but he kept falling down and required two nurses to assist him along the way. The PA treated the plaintiff and sent him back to his cell. *Id*.

On May 6, 2015, the plaintiff filed an administrative remedy procedure complaint (ARP) with the warden informing him of the events that occurred on May 5, 2015 and complaining about Officer Raja's alleged behavior. Plaintiff's ARP was dismissed. *Id*.

On May 10, 2015, the plaintiff filed another ARP (PATX 0264-15), concerning the same May 5th incident, this time including a request for relief. ECF 1 at p. 3. The plaintiff requested that Officer Raja be suspended for two weeks without pay and that the plaintiff be awarded $20,000 in damages. *Id*. The plaintiff filed a third ARP (PATX-0287-15) that asked for the same relief. It was denied. *Id*.

On June 8, 2015, the warden responded to the plaintiff's second filed ARP, PATX 0264-15. ECF 1 at p. 4. The warden stated that the plaintiff's claim regarding Officer Raja's failure to secure medical assistance for him during his seizure was investigated and there was not enough

evidence to support the plaintiff's claim. The warden noted that Officer Raja reported that he never observed or heard an emergency on the tier, the area in the prison in which the plaintiff resides, on the date of the plaintiff's seizure and that no further action would be taken through the ARP process. *Id*.

On June 16, 2015, the plaintiff appealed the dismissal of ARP PATX 0264-15 to the Commissioner of Corrections. The Commissioner dismissed the appeal. His decision found that an investigation into the incident revealed that the plaintiff was seen by medical staff on May 5, 2015, on an urgent basis, ECF 1 at p. 5, that the nurse reported giving the plaintiff medication, that the plaintiff appeared to be drowsy and confused after receiving it, and that the nurse had the plaintiff stay in the medical unit based on his history of epilepsy. The Commissioner noted that the plaintiff had reported having a seizure on the tier but had failed to substantiate his claim that he had informed either the day or the night shift of the seizure. Most importantly, the Commissioner also found that Officer Raja worked the day shift on May 5, 2015, but the plaintiff had claimed that the night shift officer was the officer who failed to call for medical assistance. *Id*.

The plaintiff then filed a complaint with the Inmate Grievance Office (IGO) appealing the Commissioner's dismissal of his ARP. ECF 1 at pp. 5–6. The IGO complaint was administratively dismissed for failure to state a claim upon which administrative relief can and should be granted. *Id*. at p. 6.

The final incident occurred on March 12, 2016. The plaintiff alleges that he went to the Patuxent medical unit at approximately 4:45 a.m. *Id.* at p. 7. When he arrived, a nurse informed the plaintiff that the doctor left orders not to give the plaintiff his medication because his phenytoin levels, at 22 mg/ul, exceeded the therapeutic range of the drug. *Id*. The plaintiff

5

returned to his cell and, at approximately 11:10 a.m., had a seizure. The plaintiff's cellmate, D. Murry, called out to Officer D. Kommgum in order to get medical assistance for the plaintiff. The plaintiff alleges that it took Kommgum 30 minutes to open his cell door and 45 minutes to call for medical assistance. *Id.* When an officer[4] arrived, "about 20 min[utes]" after the call for assistance, all of the other inmates on the tier were told to return to their cells. Medical staff arrived and attempted to treat the plaintiff. The plaintiff alleges that one of the nurses put a needle in his arm but he "did not come around." *Id.* At that time, the plaintiff states that Captain Parker yelled out for the officers to call 911 and the nurse asked the officers there to move the plaintiff into the dayroom. *Id.*

When the EMTs arrived, the plaintiff was taken to Howard County General Hospital. *Id.* After blood tests were performed, the plaintiff was told by the doctor that his phenytoin level was at 45 mg/ul, 23 mg/ul above the level he was told by the prison medical unit and 25 mg/ul above the therapeutic range of the drug. The plaintiff remained in the hospital for four days and then was sent to the JCI hospital before returning to Patuxent. *Id.* Because of this incident, the plaintiff was prescribed a new medication, Vimpat, however the plaintiff complains that it took over a week for him to receive the drug. ECF 18 at Ex. 2, p. 6.

The plaintiff filed an ARP complaint concerning the March 12, 2016, incident but received no response from the warden and no responses from the Commissioner of Corrections or the IGO when he appealed the non-response. ECF 1 at pp. 8–9.

As relief, the plaintiff seeks monetary damages of thirty thousand dollars from each defendant. *Id.* at p. 9.

---

[4] Plaintiff does not provide a name for the officer who arrived in his cell.

C. Defendants' Response

The defendants Warden Laura Armstead, Director Randall Nero, Ph.D., and Officer Muhammad Raja ("state defendants") state that the plaintiff was not observed having a seizure on May 5, 2015, nor was Officer Raja advised of a medical emergency by anyone else during his shift. ECF 37 at Ex. 2. Rather, the plaintiff reported being drowsy at 1:46 p.m. and his medical chart was updated to indicate that his phenytoin level was elevated. *Id*. at Ex. 5, pp. 19–20. The Physician's Assistant on call was notified, a notation to follow-up in the morning was made, and for the incoming nurse to be informed of the plaintiff's condition so that she could follow-up with him and continue monitoring his condition. *Id*. at p. 20. On May 20, 2015, when the plaintiff was seen he reported no problems since his last encounter with medical staff. *Id*. at pp. 16–18.

Further, ARP (PATX-0264-15), alleging that Officer Raja did not respond appropriately when notified the plaintiff was having a seizure, was investigated and dismissed. ECF 37 at Ex. 6, pp. 13–14. The investigation included an interview of Officer Raja who reported that he was never notified of the plaintiff's seizure or even that the plaintiff required emergency medical attention during his shift on May 5, 2015. In addition, the logbook from the tier where the plaintiff was housed was reviewed and there was no indication that a medical emergency occurred that day. *Id*. at pp. 22–26. The logs reflected that Officer Raja returned to his post after a meal break at 12:10 p.m. and wrote his last log book entry at that time. He was relieved of his post by Officer P. Morris at 4:10 p.m. *Id*. Thus, the plaintiff's ARP was dismissed as unsubstantiated.

On appeal to the Commissioner of Correction, the plaintiff's ARP (PATX-0264-15) was dismissed on September 17, 2015. ECF 37 at Ex. 6, p. 1. The response noted that an

investigation revealed that the plaintiff was seen on May 5, 2015, by medical staff for an urgent visit and that when the plaintiff received his medication he appeared to be drowsy and confused. *Id*. at pp. 1, 17–21. The nurse had the plaintiff stay in the medical unit for evaluation; there was no indication in the medical record that the plaintiff had a seizure or that anyone had called out to the officer on the tier saying he was having a seizure. *Id*. Because the plaintiff had failed to substantiate his claim regarding Officer Raja's alleged failure to act and neither the day nor the night shift officers indicated that the plaintiff experienced a medical emergency on May 5, 2015, the ARP appeal was dismissed. *Id*. at pp. 1, 22–26.

Correctional defendants further explain that the IGO appeal of ARP (PATX-0264-15) was dismissed on November 5, 2015, for failure to state a claim. ECF 37 at Ex. 8. Further, the plaintiff's appeal of that dismissal to the Circuit Court for Howard County was dismissed on October 12, 2016. *In the Matter of Ton Julius Thomas*, Case No. 13C15105986 (Howard Co. Cir. Ct.), http://casesearch.courts.state.md.us/inquiry. A subsequent appeal to the Maryland Court of Special Appeals was dismissed on March 16, 2017. *Id*. at docket 34 & 35.

An additional ARP (PATX-0291-16) was appealed to the IGO by the plaintiff, but was dismissed for his failure to provide supporting paperwork to indicate that the matter had been submitted to the Warden and appealed to the Commissioner of Corrections as required by regulations governing the ARP process. ECF 37 at Ex. 8, p. 2. Although the documents submitted by the plaintiff on October 24, 2016, indicate a complaint regarding his seizures, the precise nature of his claim could not be discerned from the papers submitted. *Id*. There is no record of the plaintiff appealing the November 28, 2016 dismissal of this IGO appeal. *Id*.

The defendants also dispute the plaintiff's characterization of his medical history at Patuxent. Defendants Wexford Health Sources, Inc. and Damon Fayall ("medical defendants")

8

state that the plaintiff has a significant medical history of epilepsy. The plaintiff is a chronic care patient requiring regular visits to, and evaluations by, physicians. ECF 18 at Ex. 2, p. 2. In addition, the plaintiff has access to medical staff between scheduled chronic care clinic evaluations to address his medical complaints. *Id*. Damon Fayall is not a physician and has never provided care to the plaintiff. *Id*.

In addition, none of the episodes where the plaintiff's phenytoin levels were above the therapeutic range approached the lethal level of 100. *Id*. at p. 5. The plaintiff's seizures were successfully controlled in both onset and severity without adverse side effects and there was no indication that providing phenytoin at the prescribed dose contributed in any way to the elevated levels of phenytoin. *Id*. Although the plaintiff reported to medical staff that he was having seizures every four to five weeks, he did not report the seizures at the time they occurred and his reports were often "contrary to the observations of medical providers and his medical records." *Id*. There were no visual confirmations of the plaintiff's self-reported seizures, their severity, or their duration. *Id*. The defendants argue that they have provided adequate health care to the plaintiff. They offer the lead up to the plaintiff's March 12, 2016 seizure as an example. On March 9, 2016, the plaintiff was seen by medical staff for complaints of drowsiness. *Id*. at pp. 13–14. Medical staff suspected that the plaintiff's phenytoin level was high, and on March 11, 2016 they were notified by the lab that the plaintiff's level was critically high. *Id*. at pp. 12–13. On March 12, 2016, the plaintiff was transported by ambulance to Howard County General Hospital. *Id*. at p. 11.

With regard to the plaintiff's epileptic seizure on March 12, 2016, medical records prepared by Khadijat Adebayi, R.N., indicate that medical staff was notified of an emergency at 10:57 a.m., and that medical staff responded to the plaintiff's cell at 11:03 a.m. ECF 18 at Ex. 2,

p. 2; Ex. 1, p. 77. Custody staff already had called for an ambulance, which arrived at 11:25 a.m., to take the plaintiff to Howard County General Hospital for emergency treatment. *Id*.

At the hospital the plaintiff's phenytoin levels were measured at 32.7 mg/ul on March 13, at 24.7 mg/ul on March 14, and at 25.3 mg/ul on March 15. ECF 18 at Ex. 2, p. 6. Hospital medical providers suggested that the seizure the plaintiff experienced might have been a consequence of phenytoin toxicity, which is a rare reaction, and recommended that the plaintiff's phenytoin prescription be discontinued and substituted with Vimpat. *Id*. This recommendation was made because the plaintiff experienced a seizure despite having a phenytoin level above therapeutic range. *Id*. Medical providers at Patuxent agreed with the recommendation to use Lamictal and Vimpat[7] in place of Dilantin. *Id*. The plaintiff has been prescribed Vimpat since his March 15, 2016 return to Patuxent, but it is a non-formulary drug, which means that the drug had to be ordered and approved before it could be delivered, and was therefore not received until March 24, 2016. *Id*.

Soon after receiving Vimpat, the plaintiff complained of side effects including poor appetite, vomiting, and nausea and reported that he stopped taking the medication on March 26, 2016. ECF 18 at Ex. 2, p. 6. Given this reported non-compliance, an order was added that the plaintiff must be observed taking his Lamictal medication, and the Vimpat prescription was discontinued. *Id*. When the plaintiff's Lamictal prescription was increased in dosage he complained of gastrointestinal side effects, and his medical providers adjusted it to a lower dosage. *Id*. at pp. 6–7. The plaintiff has continued to receive the lower dosage of Lamictal with good results. *Id*. at p. 7.

---

[7] Both Vimpat and Lamictal are anticonvulsant medications. Both indicate they can be used in conjunction with other anticonvulsant medications to treat epilepsy.
 *See* www.drugs.com/search.php?searchterm=Vimpat; and www.drugs.com/search.php?searchterm=lamictal.

## II. Standard of Review

### A. Summary Judgment[10]

Summary judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247–48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness[]' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted)

---

[10] Under Rule 12(d), a motion to dismiss based on matters outside the pleadings, where those matters are not excluded by the court, should be treated as a Rule 56 motion for summary judgment. Fed. R. Civ. P. 12(d). In this case, the motions to dismiss included matters outside of the pleadings, and the plaintiff was on notice that the motions might be treated as motions for summary judgment. Indeed, the plaintiff filed his own motion for summary judgment.

(quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

**II.     Analysis**

The defendants argue, in two separate motions,[11] that summary judgment should be granted in their favor because the plaintiff has failed to allege facts showing a deliberate denial of medical care or, in the alternative, because *respondeat superior* liability is not available under § 1983, and, in any event, qualified immunity bars recovery. The plaintiff also has moved for summary judgment, arguing that the defendants failed to properly investigate his administrative complaints. Because the plaintiff has failed to allege facts sufficient to create a genuine dispute as to whether the defendants deliberately withheld medical treatment or that the defendants failed to properly investigate his administrative complaints, the defendants' motions for summary judgment will be granted and the plaintiff's motion for summary judgment will be denied.

A.     The Plaintiff's Medical Claims

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). If a court finds a § 1983 violation, a public official may defend by asserting qualified immunity. The qualified immunity analysis has two prongs and this court may address the prongs in the order best suited to "the circumstances of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  The first is whether ""[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the evidence establishes a violation of a constitutional right, this court must assess whether the right was "clearly

---
[11] ECF 18 and 37

established" at the time of the events at issue. *Id*. If the evidence does not establish a violation of a constitutional right, however, "there is no necessity for further inquiries concerning qualified immunity." *Id.* In this case, there is no reason to inquire into qualified immunity, at least not its second part, because the plaintiff fails to raise a genuine dispute that his rights under the Eighth Amendment protection from cruel and unusual punishment were violated when the defendants allegedly failed to provide him adequate medical treatment.

A plaintiff alleging inadequate medical treatment under the Eighth Amendment must prove that the defendants acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). This standard applies as well to a prison doctor as it does a prison guard who "intentionally den[ied] or delay[ed] access to medical care." *Id.* Critical to the Eighth Amendment analysis under § 1983 is deliberateness. "[A]n inadvertent failure to provide adequate medical care" does not constitute cruel and unusual punishment and, therefore, "a complaint that a physician has been negligent in diagnosing or treating a medical condition" is not "a valid claim of medical mistreatment under the Eighth Amendment." *Id.* at 105–06. "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted) (*overruled in part on other grounds by Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *aff'd in pertinent part by Sharpe v. S.C. Dep't of Corr.*, 621 Fed.Appx. 732 (Mem), (4th Cir. 2015)

To prove deliberate indifference a plaintiff must meet two components. First, a plaintiff must show that, objectively, he was suffering from a serious medical need. "In medical needs cases, like the case at bar" plaintiffs are required "to demonstrate [an] official['s] deliberate indifference to a 'serious' medical need that has either 'been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the

necessity for a doctor's attention.'" *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008))

Second, a plaintiff must show that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The subjective component requires, at least, "subjective recklessness" in the face of a serious medical condition. *Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflictor . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844.

The Fourth Circuit's analysis in *Scinto v. Stansberry* helps ground the *Estelle* and *Farmer* standard. In *Scinto*, the court found the plaintiff's evidence showing that the defendant refused, more than once, to administer insulin shots to treat the plaintiff's diabetes sufficient to overcome summary judgment. The court held that the defendant "was aware of facts—[the plaintiff's] diabetes and his blood sugar value at the time of request for insulin—giving rise to an inference that failing to provide insulin could result, at least, in a substantial risk of serious harm." *Scinto*, 841 F.3d at 229. The defendant in *Scinto* took an affirmative act, despite understanding its serious medical consequences, to deprive the plaintiff of medical care.

The plaintiff's case stands in sharp contrast to these facts. It is undisputed that the plaintiff suffers from an objectively serious condition. He has a well-documented medical history of epilepsy that requires constant attention and treatment. The defendants deny, and the plaintiff fails to dispute, however, that they possessed the necessary subjective state of mind under *Farmer*, that they "knew of and disregarded an excessive risk to inmate health or safety," to overcome summary judgment. *Farmer*, 511 U.S. at 834.

The plaintiff asserts, and the record supports, that he repeatedly suffered from phenytoin overdoses over a two year period. But he never offers facts to dispute the defendants' evidence showing reasonable medical attention—the defendants carefully dosed the plaintiff's medication, phenytoin overdoses may result from causes outside of the defendants' control, the defendants promptly attended to the plaintiff's overdoses, and, in any case, the plaintiff may never have been injured by the overdoses. Far from the facts in *Scinto*, the overwhelming character of the record before this court shows competent, if imperfect, medical attention—evidence too weak to meet the *Farmer* standard. *Farmer*, 511 U.S. at 835–36 (negligence is insufficient to meet the deliberate indifference standard).

The rest of the plaintiff's claims follow in tow. Contrary to the plaintiff's unsworn claim that during a March 12 seizure it took 45 minutes for medical help to arrive, the record shows instead that the prison medical staff responded six minutes after the call for help went out. The record does show that despite being prescribed new medication on March 15, 2016, it took until March 24, 2016 for the plaintiff to receive his first dose. But the delay was not a result of indifference. The new medication was non-formulary and was not available until the date the plaintiff received it. As for the plaintiff's claim concerning Officer Raja's alleged failure to seek medical attention during one of the plaintiff's seizures, the plaintiff alleges that the incident

15

occurred during the night shift. On the day of the incident, Officer Raja was working the day shift.

Again, *Scinto* is instructive. That case also involved a claim against prison officials for failure to promptly respond to the plaintiff's medical emergency. The plaintiff there suffered severe gastrointestinal distress, vomiting up blood. After responding to the plaintiff's call for help, the defendants merely looked at the plaintiff "in disgust" and walked away without providing medical aid until at least two days after the incident. The Fourth Circuit again found the *Farmer* standard satisfied. The court held that a genuine dispute of fact was raised on the objective prong, "whether the denial of medical attention during this emergency resulted in serious injury or a substantial risk of serious injury," because of the severity of the medical issue involved. *Farmer*, 841 F.3d at 232. The plaintiff also raised a genuine dispute, through "sufficient circumstantial evidence," that the subjective prong was satisfied. The court found that there was sufficient evidence showing the defendants were aware that failing to treat the plaintiff "created a substantial risk of serious injury." *Id.*

By contrast, the plaintiff never supports, even with circumstantial evidence, his allegations against Officer Raja. More than that, the defendants directly refute the plaintiff's unsworn claims proving that, at least as the plaintiff tells it, Officer Raja could not have possibly been involved in the incident described. In short, there is no evidence that Officer Raja was aware that failing to treat the plaintiff's seizure "created a substantial risk of serious injury," *Scinto*, 841 F.3d at 232, because the unrebutted evidence shows he was not even there.

Because the plaintiff fails to provide anything more than unsworn testimony to support his claims against the defendants, and because the defendants provide unrebutted evidence that

they never recklessly or intentionally withheld medical treatment, the defendants' motions for summary judgment will be granted.

B.   The Plaintiff's Motion for Summary Judgment

The plaintiff, for his part, filed a motion for summary judgment arguing that the defendants violated due process by improperly investigating his administrative complaints. Prisoners are not afforded a free-floating constitutional right to grievance procedures. *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Indeed, the liberty interests of prisoners protected by the Due Process Clause "will be generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483 (1995).

The plaintiff's ARP complaint was investigated and found to be without merit. The failure to conduct extensive interviews of all those present during the alleged incident is not an adequate basis for a claim that the plaintiff's due process rights were infringed. Where, as here, the plaintiff has failed to reference admissible evidence that supports his claim, supervisory defendants cannot be held accountable for failing to prove the plaintiff's claim for him. The motion for summary judgment will be denied.

A separate order follows.

___8/28/2017____             _____/s/_____
Date                          Catherine C. Blake
                              United States District Judge